DAVIS & CERIANI, P.C.
Michael P. Cillo, Esq.
Scott W. Wilkinson, Esq.
1350 17th Street, Suite 400
Denver, Colorado 80202
Telephone: (303) 534-9000
(To Be Admitted *Pro Hac Vice*)

SOLOMON BLUM HEYMANN & STICH LLP
David P. Stich, Esq.
40 Wall Street, 35th Floor
New York, New York 10005
Telephone: (212 )267-7600

UNITED STATES DISTRICT COURT
OF NEW JERSEY

| | |
|---|---|
| NUVEEN MUNICIPAL TRUST on behalf of its series NUVEEN HIGH YIELD MUNICIPAL BOND FUND, a Massachusetts business trust,<br><br>     Plaintiff,<br><br>v.<br><br>WITHUMSMITH+BROWN, P.C., a New Jersey professional corporation, and LINDABURY, MCCORMICK, ESTABROOK & COOPER, P.C., a New Jersey professional corporation<br><br>     Defendants. | Civil Action No.:<br><br><br><br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Nuveen Municipal Trust, on behalf of its series Nuveen High Yield Municipal Bond Fund, having an address of 333 West Wacker Drive, Chicago, Illinois 60606-1286, for its Complaint against WithumSmith+Brown, P.C., a New Jersey professional corporation, having and address of 5 Vaughn Drive, Princeeton, New Jersey 08540, and Lindabury, McCormick, Estabrook & Cooper, P.C., having and address of 53 Carinal Drive, Westfield, New Jersey 07091, a New Jersey professional corporation, states and alleges as follows:

**PARTIES, JURISDICTION AND VENUE**

1.      Nuveen High Yield Municipal Bond Fund (the "Nuveen Fund") is a series of the Nuveen Municipal Trust which is a Massachusetts business trust and municipal bond mutual fund. At all times pertinent to this Complaint the Nuveen Fund maintained its principal place of business at 333 West Wacker Drive, Chicago, Illinois 60606. On October 11, 2006, the Nuveen Fund purchased the $10 million Bond Anticipation Note (the "Note") which forms the basis for this civil action

from the Bayonne Medical Center, Inc., a New Jersey non-profit corporation and acute care hospital ("BMC" or "Bayonne Medical Center") located at 29 East 29th Street at Avenue E, Bayonne, New Jersey 07002.

2.       WithumSmith+Brown, P.C. ("WSB"), is a New Jersey professional corporation staffed with certified public accountants licensed to practice accounting in New Jersey. At all times pertinent to this Complaint, WSB maintained its principal place of business at 5 Vaughn Drive, Princeton, New Jersey 08540. WSB audited BMC's 2005 financial statements (the "2005 Financial Statements").

3.       Lindabury, McCormick, Estabrook & Cooper, P.C. ("Lindabury"), is a New Jersey professional corporation staffed with attorneys licensed to practice law in New Jersey. At all times pertinent to this Complaint, Lindabury maintained its principal place of business at 53 Cardinal Drive, P.O. Box 2369, Westfield, New Jersey 07091. Lindabury was counsel to BMC on a number of matters and prepared an opinion letter for the Nuveen Fund in connection with the Note transaction that forms the basis for this Complaint.

4.       Jurisdiction exists by virtue of diversity of citizenship pursuant to 28 U.S.C. § 1332 as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

5.       Venue of this action lies in this Court pursuant to 28 U.S.C. § 1391(a) and (b) because one or more of the Defendants resides in this District and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, and the property that is the subject of this action is located in this District.

## SUMMARY OF COMPLAINT

6.       The Bayonne Medical Center ("BMC") was an acute care hospital located in Hudson County, New Jersey that issued a $10 million Bond Anticipation Note ("Note") in October 2006 that was purchased by the Nuveen High Yield Municipal Bond Fund (the "Nuveen Fund").

7.       WSB audited BMC's 2005 financial statements (the "2005 Financial Statements") and issued an unqualified audit report in March 2006.

8.       BMC provided the 2005 Financial Statements and WSB's unqualified audit report to the Nuveen Fund to assist it in making an investment decision with respect to the Note. The 2005 Financial Statements and WSB's unqualified audit report made BMC appear to be solvent and capable of repaying the $10 million Note through the issuance of long term bonds in 2007.

9.       The 2005 Financial Statements audited by WSB were false and misleading because they recorded substantial revenue from a sham charitable pledge and

were carrying a substantial amount of aged and uncollectible accounts receivable as assets while simultaneously reducing the reserve for uncollectible accounts receivable.

10.     WSB knew that the sham charitable pledge could not legitimately be recorded as revenue and knew that BMC was recording a substantial amount of aged (and very likely uncollectible) accounts receivable as assets while at the same time reducing its reserve for uncollectible accounts receivable.

11.     WSB knew that if the false and misleading portions of the 2005 Financial Statements were removed, the 2005 Financial Statements would show that BMC was either insolvent or would soon become insolvent.  As a result, WSB knew that BMC would have to acquire additional funding to continue operating as a going concern.  Nonetheless, WSB issued an unqualified audit report knowing that it was improper to do so and knowing that such report would be distributed to actual and potential lenders such as the Nuveen Fund and would be relied upon by such actual lenders (so they could determine whether BMC was in compliance with loan covenants) and potential lenders (so they could decide whether to loan money to BMC).

12.     BMC was represented by Lindabury in connection with the issuance of the Note. The Loan and Security Agreement for the Note required Lindabury to issue a legal opinion to the Nuveen Fund addressing the existence or nonexistence of certain matters that could reasonably be anticipated to have a negative impact on the ability of BMC to repay the Note ("Lindabury Opinion").

13.     In September 2006 BMC was notified by Medicare through its intermediary, Riverbend Government Benefits Asministration, that BMC owed Medicare over $3.4 million for the 2004 fiscal year.

14.     The Lindabury Opinion falsely represented that there were no inquiries or investigations by any entity pending that, if resolved adversely to BMC, would have a material negative impact on BMC's ability to repay the Note.   The Lindabury Opinion was misleading due to the failure to disclose the existence and amount of the debt BMC owed to Medicare and the terms of the repayment plan BMC had proposed to Medicare.

15.     The Nuveen Fund purchased the Note in October 2006 in reliance upon the 2005 Financial Statements, WSB's unqualified audit report and the Lindabury Opinion without knowledge of the truth with respect to the above matters.

16.     The Medicare intermediary approved a repayment plan that would require BMC to pay $158,000 per month for 24 months, therby increasing BMC;s liabilities by as much as $3.6 million during the time period the Note would be outstanding.

17.   BMC's internal financial report for October 2006 was released in December 2006 (about two months after the Note was purchased) and disclosed substantial payments owed by BMC to Medicare and reflected the write off of substantial aged accounts receivable from 2005 which, among other things, rendered BMC insolvent.

18.   BMC filed for bankruptcy protection in March 2007 and is currently being liquidated. The Nuveen Fund has suffered substantial damages as a result of the fraudulent conduct of WSB and the negligent conduct of Lindabury.

## GENERAL ALLEGATIONS APPLICABLE TO ALL CLAIMS FOR RELIEF

**Financial Pressure and the Need to Modernize Led the Bayonne Medical Center to Prepare Fraudulent Financial Statements in an Effort to Attract Lenders**

19.   As of 2005, Bayonne Medical Center ("BMC") was an older 278 bed acute care hospital located in Hudson County, New Jersey that found itself in an increasingly competitive environment and, like many older hospitals, was encountering increasing costs, decreasing revenues and the need to modernize.

20.   As of 2005, BMC had about $35 million in outstanding debt in the form of long term tax exempt bonds which had been issued on its behalf by the New Jersey Health Care Facilities Financing Authority (the "Authority") in 1994 (the "1994 Bonds") and 1998 (the 1998 Bonds)(collectively the "Existing Bonds").

21.   The officers and directors of BMC concluded that the hospital needed to improve operations, make significant capital improvements to the hospital, and seek to pay for the capital improvements and reduce its debt service burden by causing the Authority to issue new long term bonds on behalf of BMC.

22.   BMC planned to use the proceeds from the issuance of new long term bonds to refund (or pay) the Existing Bonds, pay the $10 million Note purchased by the Nuveen Fund and pay for the needed capital improvements.

23.   The Loan Agreements and Trust Indentures for the Existing Bonds permitted BMC to issue additional debt which could be secured by a proportional security interest in BMC's accounts receivable.

24.   The Loan Agreements and Trust Indentures for the Existing Bonds provided that BMC must maintain certain financial ratios, including a debt service coverage ratio of at least 1.25 (which meant BMC had to have sufficient cash flows available to cover the principal and interest payments on the Existing Bonds and other debt (as defined in the Loan Agreements and Trust Indentures for the Existing Bonds) 1.25 times (or by a margin of 125 percent)).

25. The Loan Agreements and Trust Indentures for the Existing Bonds provided that the debt service coverage ratio would be tested at the end of each fiscal quarter on the basis of the preceding twelve-month period, based on BMC's audited and unaudited financial statements.

26. The Loan Agreements and Trust Indentures for the Existing Bonds also required BMC to prepare and deliver to the Authority unaudited financial statements prepared on a monthly basis and audited financial statements for the preceding fiscal year prepared in accordance with Generally Accepted Accounting Principles ("GAAP").

27. The Loan Agreement for the 1998 Bonds provided that, concurrently with the delivery of the audited financial statements, BMC was required to deliver or cause to be delivered to the Authority:

> "A letter from an independent firm of certified public accountants, stating that (i) such firm understands and agrees that the borrower plans to provide the authority with a copy of the audited financial statements and any report issued in connection therewith, (ii) such firm further understands that the authority intends to rely upon the audited financial statements and any report issued in connection therewith, and that the borrower intended for the authority to so rely, and (iii) such firm knew that the authority intended to rely upon such financial statement."

28. The Loan Agreements and Trust Indentures for the Existing Bonds required the appropriate officer of BMC to certify the accuracy of the debt service coverage ratio calculation and the accuracy and completeness of the financial statements to the Authority.

29. Consistent with the requirements of the Loan Agreements and Trust Indentures for the Existing Bonds, BMC prepared unaudited monthly financial statements, caused audited financial statements to be prepared on an annual basis, certified the accuracy of the debt service coverage ratio calculations and certified the accuracy and completeness of the financial statements.

30. However, by late 2005 the financial condition of BMC had declined to the point where it could no longer meet its debt service coverage ratio covenant without fraudulently reporting inflated revenues, overstated assets and understated liabilities in the 2005 Financial Statements.

31. From 2003 through the end of 2005, BMC experienced more than $23.5 million of cash flow deficits from operating activities causing BMC to liquidate more than $10.6 million in investments without reducing its debt.

32.   It was in this context that BMC prepared the 2005 Financial Statements and engaged Defendant WSB to conduct an audit examination of the 2005 Financial Statements.

33.   WSB completed the 2005 audit examination and issued an unqualified Independent Auditors' Report dated February 22, 2006.

34.   The Independent Auditors' Report represents that WSB audited the Consolidated Balance Sheet of Bayonne Medical Center and its affiliate as of December 31, 2005, and the related Consolidated Statements of Operations, Changes in Net Assets and Cash Flows for the year then ended in accordance with Generally Accepted Auditing Standards ("GAAS").

35.   As alleged in more detail below, BMC and Defendant WSB fraudulently reported that BMC was in substantially better financial condition that it was in and falsely represented that BMC was in compliance with the 1.25 minimum debt service coverage ratio covenant.

36.   To accomplish this, BMC: (1) recorded $4.6 million in revenue from a $5.0 million sham pledge of a charitable contribution (the "Sham Pledge"); (2) overstated patient accounts receivable and understated the provision for uncollectible accounts receivable; and, (3) fraudulently certified that it was in compliance with financial ratios, including the required 1.25 minimum debt service coverage covenant.

37.   WSB was required to examine each of these aspects of the 2005 Financial Statements and, despite these deficiencies, WSB issued an unqualified audit report knowing it was improper to do so.

**The Sham $5 Million Pledge of a Charitable Contribution**

38.   In its 2005 Financial Statements, BMC recognized over $4.6 million in revenue from the Sham Pledge:

    a.   BMC's Consolidated Balance Sheet as of December 31, 2005 which was audited by WSB and opined on in WSB's Independent Auditors' Report, reflected a "Pledge Receivable" which was valued as of December 31, 2005 at approximately $4.6 million.

    b.   The Pledge Receivable is reported in the 2005 Consolidated Statement of Operations as part of $17,085,553 in "Other Revenue."

    c.   The 2005 Consolidated Statement of Operations reports $418,448 of excess revenue over expense which was the reported operating profit of BMC for 2005.

    d.    The 2005 Consolidated Statements of Cash Flows reflects an increase in Pledges Receivable of $5,324,783 that included the Sham Pledge.

    e.    The 2005 Consolidated Statement of Cash Flows contains a "Provision for Uncollectible Pledges" of just $226,430 for 2005.

    f.    Note 1 (titled "Organization and Significant Accounting Policies") to the 2005 Financial Statements makes the following representation regarding "Pledges Receivable":

> "Unconditional promises to give are recorded at fair value at the date the promise is received. Unconditional promises to give that are expected to be received after one year are discounted at a risk free interest rate and amortization of the discount is included in contribution revenue. Conditional promises to give are reported at fair value at the date the condition is met."

39.    The Sham Pledge was a sham because it was unenforceable and contingent upon terms and conditions that were unlikely to be satisfied.

40.    As a result, BMC fraudulently reported at least $4.6 million of income in its 2005 fiscal year and fraudulently concealed at least $4.2 million of operating losses.

41.    The $4.2 million of what were, in substance, operating losses resulted in BMC's failure to meet its required 1.25 minimum debt service coverage ratio covenant for the Existing Bonds.

42.    Without the $4.6 million in recorded revenue attributed to the Sham Pledge, the funds available for debt service (as defined in the Loan Agreements and Trust Indentures for the Existing Bonds) were $5.6 million, an amount substantially less than the $7.3 million minimum annual debt service requirement.

43.    The officers and directors of BMC and, as alleged below, Defendant WSB when it conducted the audit examination of the 2005 Financial Statements and issued an unqualified audit report, accounted for the Sham Pledge in a manner that violated generally accepted accounting and auditing standards, knowing that such action would make BMC appear financially viable and in compliance with the required 1.25 minimum debt service coverage ratio covenant when in fact, it was not.

44.    As a result, these misrepresentations falsely portrayed BMC as an attractive borrower.

**BMC Fraudulently Overstated Accounts Receivable**

45.   BMC fraudulently inflated accounts receivable and fraudulently decreased the reserve for uncollectible accounts receivable to make it appear as if BMC's financial condition was substantially better than it actually was.

46.   Despite declining net patient revenues of approximately 10% in 2004 and approximately 7% in 2005, patient accounts receivable increased approximately 11% in 2004 and a massive 34% in 2005.

47.   Accounts receivable balances also substantially increased in age between 2002 and 2005.  For the year-ended December 31, 2002, accounts receivable were outstanding, on average, 38.2 days.  By the end of 2005, the average collection took 86.7 days.

48.   BMC's accounts receivable average age did not compare well with New Jersey acute care hospital averages.

49.   The average age of BMC's accounts receivable was 49.1 days in 2003, 60.7 in 2004 and 86.7 in 2005.  According to the New Jersey Hospital Association ("NJHA") survey, other New Jersey acute care hospitals averaged 53.9 days in 2003 and 52.7 days in 2004.

50.   The increase in the age of accounts receivable was a strong indication to WSB when it was conducting the audit that substantial amounts of the accounts receivable were unlikely to be collected.

51.   The loss provisions for uncollectible accounts receivable were also understated and inadequate.

52.   The provision for doubtful accounts receivable declined substantially in 2004 and 2005 despite the rapid buildup of unpaid amounts.

53.   The ratio of the estimated reserve for loss to gross accounts receivable was approximately 40% in 2003, meaning that approximately $4 out of every $10 of the accounts receivable balance was written off.

54.   By 2005, the ratio declined to approximately 29% (meaning that just $2.90 out of every $10 of the accounts receivable balance was written off) despite the fact that 2005 accounts receivable were substantially older and substantially less likely to be collected.

55.   Bad debt expense in 2005 was $6.6 million, or approximately 53% of the corresponding expense of $11.9 million in 2003 when accounts receivable were significantly less aged.

56. BMC was reserving substantially less for uncollectible accounts receivable in 2004 than other New Jersey acute care hospitals and the failure to reserve adequately was even more flagrant in 2005.

57. BMC's reserve for uncollectible receivables was 40.2% of gross accounts receivable in 2003 compared to 40.9% for New Jersey acute care hospitals.

58. BMC's reserve for uncollectible receivables was just 34.9% in 2004 compared to 42.5% for New Jersey acute care hospitals.

59. In 2005, BMC's reserve for uncollectible accounts receivable dropped to 28.7%, far below what was indicated from previous years at BMC and far below the historic averages for New Jersey acute care hospitals.

60. The decline in BMC's reserve for uncollectible accounts receivable, in the face of increased accounts receivable and increased aging of accounts receivable, was a strong indication to WSB, when it audited the 2005 Financial Statements and issued an unqualified audit report, that BMC was fraudulently inflating revenues from accounts receivable by refusing to write off uncollectible receivables while simultaneously refusing to increase reserves for uncollectible accounts receivable.

**BMC Fraudulently Represented it was in Compliance with the Required 1.25 Minimum Debt Service Coverage Ratio**

61. In Note 9 to the 2005 Financial Statements BMC falsely represented that it was in compliance with the 1.25 debt service coverage ratio:

> "Under the terms of various debt agreements, the Medical Center is required to be in compliance with certain financial covenants and ratios. At December 31, 2005 and 2004, the Medical Center was in compliance with the financial ratio requirements described in the agreements.

62. The above reference to "various debt agreements" is a reference to the Loan Agreements and Trust Indentures for the Existing Bonds.

63. For the above alleged reasons, BMC was not in compliance with the 1.25 debt service coverage ratio because the actual ratio was substantially less than 1.0.

64. For the reasons alleged above and below, WSB knew that the above alleged representation in Note 9 to the 2005 Financial Statements was false because it knew the Sham Pledge could not legitimately be recognized as revenue.

**WSB Fraudulently Issued a "Clean" or "Unqualified" Audit Report**

65.   As the auditors of the 2005 Financial Statements, WSB was required to comply with GAAP and GAAS.

66.   Paragraph .13 of AU§316 of the American Institute of Certified Public Accountants ("AICPA") Professional Standards requires auditors to exercise professional skepticism in their work.

67.   Paragraph .02 of AU§333 of AICPA Professional Standards states that reliance on management representations is "not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit."

68.   Paragraph .02 of AU§110 of AICPA Professional Standards states that an auditor "has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud."

69.   While BMC prepared the 2005 Financial Statement, it was the responsibility of WSB, as represented in the Independent Auditors' Report "to express an opinion on these consolidated financial statements based on our audit."

70.   WSB's opinion was that the 2005 Financial Statements were prepared in accordance with GAAP and that WSB's audit examination was conducted in accordance with GAAS.

71.   WSB represented as follows with respect to compliance with auditing standards:

>      "We conducted our audit in accordance with auditing standards generally accepted in the United States of America.   Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.   An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.   An audit also includes assessing the accounting principals used and significant estimates made by management, as well as evaluating the overall financial statement presentation.   We believe that our audit provides a reasonable basis for our opinion."

72.   WSB issued the following opinion in the Independent Auditors' Report:

>      "In our opinion, the 2005 consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Bayonne Medical Center and

Affiliate as of December 31, 2005, and their consolidated results of operations, consolidated changes in net assets and consolidated cash flows for the year then ended, in conformity with accounting principals generally accepted in the United States of America."

73.   Paragraph .14 of AU§508 of AICPA Professional Standards states:

"A member shall not (1) express an opinion or state affirmatively that the financial statements or other financial data of any entity are presented in conformity with Generally Accepted Accounting Principles... if such statements or data contains any departure from an accounting principle promulgated by bodies designated by Counsel to establish such principles that has a material affect on the statements or data taken as a whole..."

74.   For the reasons alleged above and below in this Complaint, WSB knew that it did not conduct the audit in accordance with auditing standards generally accepted in the United States of America, knew that BMC did not prepare the BMC financial statements in conformity with accounting principals generally accepted in the United States of America and knew that the BMC financial statements referred to in the Independent Auditors' Report did not present fairly in all material respects the consolidated financial position of BMC and its affiliate as of December 31, 2005.

75.   For the reasons alleged above and below in this Complaint, WSB knew at the time it issued the Independent Auditors' Report that the following representations were false: (1) that the Audit Report was prepared in compliance with auditing standards generally accepted in the United States of America; (2) that the BMC financial statements were prepared "in conformity with accounting principals generally accepted in the United States of America;" and, (3) that the BMC financial statements "present fairly, in all material respects" the financial position of BMC and its affiliate as of December 31, 2005.

**GAAP Prohibited Recognition of Revenue From Conditional or Unenforceable Pledges**

76.   Generally Accepted Accounting Principles in effect since 1994 are clear on the conditions under which revenue from a pledged contribution may be recognized.

77.   Under the provisions of Paragraph 5 of Financial Accounting Standards Board ("FASB") Statement 116, "Accounting for Contributions Received and Contributions Made", a contribution is defined as:

"... an unconditional transfer of cash or other assets to an entity or a settlement or cancellation of its liabilities in a voluntary nonreciprocal transfer by another entity acting other than as an

> owner.   Other assets include securities, land, buildings, use of
> facilities or utilities, materials and supplies and intangible assets,
> services and unconditional promises to give those items in the
> future."

78.   Paragraph 6 of FASB Statement 116 further provides:

> "A promise to give is a written or oral agreement to contribute cash
> or other assets to another entity; however, to be recognized in
> financial statements there must be sufficient evidence in the form
> of verifiable documentation that a promise was made and received.
> A communication that does not indicate clearly whether it is a
> promise is considered an unconditional promise to give if it
> indicates an unconditional intention to give that is legally
> enforceable."

79.   WSB knew that the Sham Pledge was conditional, was not an unconditional
promise to give, and knew that FASB Statement 116 prohibited BMC from
recording the pledge as revenue.

80.   Paragraph 7 of FASB Statement 116 defines a conditional promise as follows:

> "A donor imposed condition on a transfer of assets or a promise to
> give specifies a future and uncertain event whose occurrence or
> failure to occur gives the promisor a right of return of the assets
> transferred or releases the promisor from its obligation to transfer
> assets…"

81.   Paragraph 22 of FASB Statement 116 defines a conditional promise as follows:

> "… Conditional promises to give, which depend on the occurrence
> of a specified future and uncertain event to bind the promisor, shall
> be recognized when the conditions on which they depend are
> substantially met, that is, when the conditional promise becomes
> unconditional.   A conditional promise to give is considered
> unconditional if the possibility that the conditions will not be met
> is remote…a transfer of assets with a conditional promise to
> contribute them shall be accounted for as a refundable advance
> until the conditions have been substantially met…"

82.   Paragraph 23 of FASB Statement 116 defines a conditional promise as follows:

> "…Determining whether a promise is conditional or unconditional
> can be difficult if it contains donor stipulations that do not clearly
> state whether the right to receive payment or delivery of the
> promised asset depends upon meeting those stipulations.   It may be

difficult to determine whether those stipulations are conditions or restrictions.  In cases of ambiguous donor stipulations, the promise containing stipulations that are not clearly unconditional shall be presumed to be a conditional promise."

83.   As the independent auditor of the BMC 2005 Financial Statements, WSB was required to review the documents evidencing the $5 million Sham Pledge, determine the terms and conditions of the Sham Pledge and the collectability of the gift, and confirm in writing with the contributor the critical terms and conditions of the Sham Pledge.

84.   As a result, WSB knew that the Sham Pledge was conditional, unenforceable, and was, very likely, a pretext designed to make the hospital appear as if its operating revenues exceeded its operating expenses and it was in compliance with its debt service coverage covenants when, in fact, BMC had defaulted on its covenant.

85.   WSB knew that the Sham Pledge was, at most, a conditional promise.

86.   WSB, as independent auditor of the 2005 Financial Statements, was bound to express its professional opinion as to whether the 2005 Financial Statements were prepared in accordance with Generally Accepted Accounting Principles.

87.   FASB Statement 116 was the GAAS that applied to the Sham Pledge.

88.   WSB knew that BMC failed to comply with FASB Statement 116.

89.   WSB intentionally allowed BMC to record the Sham Pledge as Other Revenue and as unrestricted revenue so that BMC could conceal its operating deficits and make it fraudulently appear as if the hospital was in compliance with the required 1.25 minimum debt service coverage covenant required for the Existing Bonds.

90.   But for the recording of the fraudulent revenue represented by the Sham Pledge, BMC was in default on the Existing Bonds.

91.   WSB knew the Sham Pledge was a pretext designed to cover up BMC's cash flow deficiencies and make BMC appear more attractive to institutional lenders.

92.   WSB knew that Generally Accepted Auditing Standards   ("GAAS") and Generally Accepted Auditing Principles ("GAAP") provided that WSB could not issue an unqualified independent auditors' report that asserted the 2005 Financial Statements were prepared in accordance with GAAP and their audit examination was conducted in accordance with GAAS.

**WSB Knowingly Failed to Conduct its Audit Examination of the 2005 Financial Statements in Accordance with Generally Accepted Auditing Standards by Knowingly Failing to Ensure that BMC had Adequately Reserved for Uncollectible Accounts Receivable**

93. As alleged above, the age of BMC's accounts receivables was substantially greater than other in 2005 New Jersey acute care hospitals and BMC's reserve for uncollectible accounts receivable was substantially lower than other New Jersey acute care hospitals.

94. WSB was required by GAAS to, and did, read BMC's audited financial statements for prior years which, in BMC's case, were prepared by other accounting firms.

95. As a result of reviewing the prior audited financial statements, WSB was aware of the above alleged changes in BMC's estimates for uncollectible accounts receivable.

96. AU§329 and AU§369 of AICPA Professional Standards required WSB to perform comparative analyses between BMC and other acute care hospitals to determine the nature and extent of audit procedures that must be applied to balances such as accounts receivable, reserves for uncollectible accounts receivable and the provision for losses from receivables.

97. These procedures are used as substantive tests of account balances and serve as tests to assess the conclusions of auditors to support their report on the financial statements.

98. Paragraphs .04, .05 and .22 of AU§329 of AICPA Professional Standards state that the existence of "unusual or unexpected" balances or relationships "may indicate that additional evidence may be needed."

99. The above alleged increases in accounts receivable at a time when there were substantial increases in the age of accounts receivable and decreases in reserves for uncollectible accounts receivable were unusual and unexplained relationships within the meaning of Paragraph .72 of AU§369 of AICPA Professional Standards that indicated a risk of misstatement due to fraud and required WSB to obtain additional evidence and perform a comparative or analytical analysis.

100. The massive increase in accounts receivable in 2005 was known to WSB.

101. The statistics published by the New Jersey Hospital Association demonstrated that the substantial increases in BMC's accounts receivable aging were highly unusual when compared to other New Jersey acute care hospitals.

102.    The statistics published by the New Jersey Hospital Association demonstrated that the substantial decreases in BMC's reserve for uncollectible accounts receivable was highly unusual when compared to other New Jersey acute care hospitals.

103.    WSB knew the New Jersey Hospital Association published the above alleged statistics and knew that it was required by GAAS to review industry statistics like the statistics published by the NJHA.

104.    WSB either reviewed the statistics published by the New Jersey Hospital Association and knew the changes in days accounts receivable were outstanding and decreases in the reserve for uncollectible accounts receivable were highly suspect or fraudulent, or knew that it was required to and intentionally failed to perform the analysis.

**WSB Knew BMC Failed to Comply with the Required 1.25 Minimum Debt Service Coverage Covenant and was in Default on the Existing Bonds**

105.    Given the above alleged representation in Note 9 of the 2005 Financial Statements that BMC was in compliance with "financial ratio covenants," WSB was required to review the Loan Agreements and Trust Indentures for the Existing Bonds and confirm that BMC was in compliance with the required 1.25 minimum debt service coverage covenant described in those documents.

106.    WSB could not issue an unqualified audit report if BMC was not in compliance with the required 1.25 minimum debt service coverage ratio.

107.    Paragraphs .05 and .06 of AU§34 of AICPA Professional Standards required WSB to consider loan defaults.

108.    As alleged above, BMC was not in compliance with the 1.25 debt service coverage ratio and was in default on the $35 million remaining principal balance of the Existing Bonds.

109.    For all the above alleged reasons, WSB's unqualified audit report amounted to a knowingly false certification that BMC was in compliance with the 1.25 debt service coverage ratio covenant.

**GAAS Required WSB to Make a Going Concern Disclosure but WSB Intentionally Failed to Make the Disclosure**

110.    GAAS was explicit about WSB's responsibility to evaluate whether there was a substantial doubt about BMC's ability to operate as a going concern.

111.    Paragraph .05 of AU§341 of AICPA Professional Standards required WSB to perform a review of BMC's compliance with the terms and conditions of loan agreements.

112.   Paragraph .06 of AU§341 of AICPA Professional Standards required WSB to consider conditions and events such as negative trends (recurring operating losses, working capital deficiencies, negative cash flows from operating activities, adverse key financial ratios) and other indications of possible financial difficulties (default on loan or similar agreements, need to seek new sources of capital or methods of financing or to dispose of substantial assets).

113.   If an auditor concludes that there is substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time, but no more than one year, then Paragraphs .12 and .13 of AU§341 of AICPA Professional Standards requires the audit report to include an explanatory paragraph that utilizes the phrase "substantial doubt about its (the entity's) ability to continue as a going concern..."

114.   BMC's audited financial statements for prior years, which WSB reviewed, showed that BMC suffered from chronic operating deficits.

115.   BMC's chronic operating deficits, its failure to comply with its debt service coverage covenant in 2005, and its default on the $35 million remaining principal balance of the Existing Bonds raised serious doubts among the WSB audit staff regarding the hospital's ability to continue to meet its obligations without the substantial liquidation of assets outside the ordinary course of business.

116.   For all the above alleged reasons, WSB had substantial doubt regarding BMC's ability to continue as a going concern, knew that it was required not to issue an unqualified audit report and knew that it was required to make a going concern disclosure.

117.   WSB nonetheless issued an unqualified audit report and failed to issue a going concern opinion.

118.   WSB's issuance of an unqualified audit report and failure to state a going concern disclosure was a critical departure from GAAS.

**WSB's Unqualified Audit Report Allowed BMC to Provide the 2005 Financial Statements and Unqualified Audit Report to Potential Lenders and to Continue Issuing Fraudulent Certifications and Internal Financial Statements**

119.   In an effort to help keep BMC afloat until it could attract new lenders, WSB issued the unqualified audit report and did not object to the above alleged fraudulent estimates of uncollectible accounts receivable, did not object to the Sham Pledge and did not object to BMC's representation that it was in compliance with financial covenants.

120.   WSB knew BMC would provide the 2005 Financial Statements and WSB's unqualified audit report to third parties, including existing and potential lenders, and was also aware of the New Jersey Accountant Liability Act, N.J. Stat. Ann. Section 2A-53a-25 (1994)(the "Accountants' Act")

121.   The Accountants' Act provides that "not withstanding any other law" a third party cannot hold an accountant liable for negligence unless the accountant (1) knew at the time of the engagement or agreed afterwards that the accountant's work product could be made available to the claimant; (2) knew that the claimant intended to rely upon the accountant's work product in connection with a specified transaction; and (3) directly expressed to the claimant by words or conduct the accountant's understanding of the claimant's intended reliance.

122.   The Accountants' Act is based upon model legislation proposed by the American Institute of Certified Public Accountants and WSB was familiar with the statute when it audited the 2005 Financial Statements.

123.   WSB had no intention of directly or indirectly providing consent within the meaning of the Accountants' Act to rely upon the 2005 Financial Statements and WSB's unqualified audit report to anyone outside BMC and its board of trustees because, for the above alleged reasons, WSB knew the 2005 Financial Statements and unqualified audit report were false and misleading.

124.   WSB did not want to say anything in its unqualified audit report that might compromise BMC's ability to provide the unqualified audit report to potential lenders.

125.   WSB prepared a cover letter dated March 20, 2006 that is addressed "To the Audit Committee of the Board of Trustees Bayonne Medical Center" and used it to transmit the completed audit and unqualified audit report to BMC (the "March 20, 2006 Transmittal Letter")

126.   The March 20, 2006 Transmittal Letter , in part, stated:

> "This report is intended solely for the information and use of the audit committee, management, and Board of Trustees and is not intended to be and should not be used by anyone other than those specified parties."

127.   WSB knew the cover letter could be easily removed by BMC before it provided the 2005 Financial Statements and unqualified audit report to existing and potential lenders.

128.   WSB knew the above statement could and should have been included in its unqualified audit report so that WSB could ensure it would be seen and reviewed by existing and potential lenders.

129.  BMC completed the unaudited monthly financial statements for June 2006 on July 26, 2006.

130.  The June 2006 unaudited financial statement reflects assets in the "Other Receivables" category of $8,313,833, "estimated third-party payer settlements" of $7,212,561 and "patient accounts receivable (net of estimated uncollectibles)" of $30,232,108.

131.  In the liabilities and net assets section of the June 2006 balance sheets, BMC reported current liabilities in the "estimated third-party payer settlements" category of "-" (or zero third-party payer settlements that were owed by the hospital as of June 30, 2006).

132.  The above assets reported in the June 2006 financial statements were fraudulent because BMC knew that it had been wrongfully inflating accounts receivable, was including aged accounts receivable which were no longer collectible, and was wrongfully reducing the reserve created for uncollectible accounts receivable.

133.  BMC also recorded a fraudulent asset in the "Other Assets" category arising out of BMC's attempt to acquire a hospital located on Staten Island and knew that it was negotiating a substantial settlement with a third party payor (Medicare) that it anticipated would cost BMC at least $5 million.

**The Note was Offered to the Nuveen Fund and Loan Documents were Prepared**

134.  On August 10, 2006 the BMC board of directors adopted a resolution authorizing BMC to obtain up to $10,000,000 in bond anticipation financing in the form of a Bond Anticipation Note (the "Note") to be used as operating capital to finance capital expenditures and to reimburse prior capital expenditures.

135.  BMC contacted Raymond James & Company, Inc. ("Raymond James") a securities broker-dealer and investment banking firm to assist it in marketing and selling the Note.

136.  BMC provided the 2005 Financial Statements with WSB's unqualified audit report and its unaudited June 2006 financial statements to Raymond James to be provided to potential purchasers of the $10 million Note.

137.  Raymond James sent a request for indications of interest in funding the Note to the Nuveen Fund and other potential investors on about August 17, 2006.

138.  The Nuveen Fund expressed interest and Raymond James provided the Nuveen Fund with the 2005 Financial Statements with WSB's unqualified audit report and BMC's June 2006 financial statements.

139.   The Nuveen Fund did not receive the March 20, 2006 Transmittal Letter from any source.

140.   The Nuveen Fund read and reasonably relied upon the content of the 2005 Financial Statements and WSB's unqualified audit report in connection with making a decision with regard to purchasing the $10 million Note.

141.   The 2005 Financial Statements and WSB's unqualified audit report made it reasonably appear to the Nuveen Fund that BMC was generating an operating surplus and was in compliance with its required minimum debt service coverage covenant on the Existing Bonds.

142.   The Nuveen Fund wouldn't have purchased the Note if it had known the truth regarding the above alleged matter.

**BMC Received Notice that it Owed Medicare Over $3.4 Million as the Result of an Audit Completed in September 2006**

143.   On September 15, 2006 BMC received a "Notice of Medicare Program Reimbursement" from Riverbend Government Benefits Administrator, a Medicare Part A intermediary, that gave BMC notice that an examination of BMC's Medicare Statement of Reimbursable Costs which was submitted for the fiscal year ended December 31, 2004 had been conducted and that, as a result of the audit, BMC owed Medicare $3,488,557.

144.   The Notice of Medicare Program Reimbursement was provided to BMC pursuant to the requirements of 42 CFR 405.1803.

145.   In accordance with 42 CFR 447.30, if BMC did not pay Medicare in full or request extended repayment by September 30, 2006, Medicare could withhold BMC's share of current Medicare payments until payment in full was received or an acceptable repayment request was received and approved.

146.   BMC requested a repayment plan and submitted appropriate documentation.

147.   BMC had the right to appeal the determination to the Provider Reimbursement Review Board within 180 days of September 15, 2006.

148.   BMC did not disclose the existence of the Notice of Medicare Program Reimbursement and the $3.4 million debt to the Nuveen Fund.

149.   The Nuveen Fund, not knowing the truth with respect to the above alleged false and misleading statements in the 2005 Financial Statements and unqualified audit report and not knowing of BMC's $3.4 million debt to Medicare, notified BMC that it would purchase the $10 million Note subject to the terms and conditions of

a to be drafted Loan and Security Agreement and other documents addressing the specific terms and conditions of the Note.

150.   BMC made its first payment towards the settlement in the amount of $142,925.46 on September 29, 2006.

151.   BMC knew before the Note was issued and purchased by the Nuveen Fund that the settlement with Medicare would have a material negative impact on the ability of BMC to repay the Note because, as of late September and early October 2006, BMC was either insolvent or on the verge of insolvency.

152.   The Note Loan and Security Agreement represented that BMC contemplated issuing additional long term bonds to repay the $10 million Note, to refund the Existing Bonds and to pay for the costs of capital expenditures and to-be-completed capital improvements.

153.   The Note Loan and Security Agreement provided that the Note was due and payable no later than September 10, 2007 (eleven months after the Note was issued).

154.   The Note Loan and Security Agreement provided that BMC would zealously pursue its application to the Authority seeking the issuance of new long term bonds to, among other things, refinance the Note and refund the Existing Bonds.

155.   The Note Loan and Security Agreement also provided that BMC would cause its investment banking firm to offer the Nuveen Fund the right to purchase a large amount of the to be issued long term bonds.

156.   The Note Loan and Security Agreement was structured with a $500,000 loan reserve which was retained by the Nuveen Fund as a form of debt service reserve.

157.   The Note was secured along with the Existing Bonds by a proportional security interest in BMC's accounts receivable.

158.   The Note was issued under the Fourth Supplemental Trust Indenture to the Existing Bonds.

**Lindabury Issued a False and Misleading Legal Opinion to the Funds**

159.   At all times pertinent to this Complaint, Lindabury acted as outside counsel to BMC on a variety of matters, including the issuance of the Note.

160.   The Loan and Security Agreement between BMC and the Nuveen Fund dated October 11, 2006 provided that, as a condition precedent to the Nuveen Fund's obligation to purchase the Note, the Nuveen Fund was to receive an opinion letter from BMC's counsel, Lindabury, in a form and substance satisfactory to the Nuveen Fund.

161.   In response to the requirements of the October 11, 2006 Loan and Security Agreement between BMC and the Nuveen Fund, Lindabury provided the Nuveen Fund with a written opinion dated October 11, 2006 regarding "$10,000,000 Bayonne Medical Center, Inc. Bond Anticipation Note dated October 11, 2006 (the "Bond Anticipation Note")" (the "Lindabury Opinion").

162.   The Lindabury Opinion stated that the Note was being issued for the purpose of: "(a) funding certain capital improvements and capital expenditures at a 278 bed, acute care, hospital in Hudson County, New Jersey, and (b) reimbursement to [BMC] for prior capital improvements and expenditures."

163.   The Lindabury Opinion further stated that Lindabury had:

   (i) examined such other agreements, documents, certificates, opinions, letters and other papers, including all documents delivered or distributed upon delivery of the Note, (ii) made such other examinations and investigations as to matters of fact and law, and (iii) made such inquiries of Borrower, as we deemed relevant and necessary as a basis for the opinions hereinafter set forth, as we have deemed necessary or appropriate in rendering the opinions set fort [sic] below.

164.   The Lindabury Opinion rendered ten opinions relating to the Note transaction in separate numbered paragraphs.  Paragraph 7 of the Lindabury Opinion states:

   Except for the Medicare Outlier Investigation (as defined in the Loan Agreement), there is no action, suit, proceeding, inquiry or investigation at law or in equity or by any judicial or administrative court, agency, body or other entity pending with respect to which the Borrower has received notice or, to the best of our knowledge, threatened, against the Borrower or any of its properties wherein an unfavorable decision, ruling or finding: (a) could reasonably be expected to adversely affect the validity or enforceability of the Loan Documents; (b) could reasonably be expected to result in any materially liabilities not wholly covered by insurance or reserves; or (c) could reasonably be expected to otherwise materially adversely affect the capability of the Borrower to comply with its obligations under the Loan Documents, or materially adversely affect the transactions contemplated to be consummated on the part of the Borrower as described in the Loan Agreement.

165.   The above quoted statement from the Lindabury Opinion is false because the September 15, 2006 Notice of Medicare Program Reimbursement, and the subsequent proceedings related thereto, was a "proceeding, inquiry or investigation at law or in equity" by an "agency, body or other entity" that was "pending" with respect to which BMC had received notice at the time the Note

was purchased and the Lindabury Opinion was issued wherein an "unfavorable decision, ruling or finding" was expected by BMC to "materially adversely affect" the capability of BMC to "comply with its obligations under the Loan Documents" and to "materially adversely affect the transactions contemplated to be consummated on the part of the Borrower as described in the Loan Agreement."

166.    The Lindabury Opinion was misleading due to the failure to disclose that BMC had previously received a Notice of Amount of Medicare Program Reimbursement dated September 15, 2006 which required BMC to reimburse Riverbend Government Benefits Administrator (the Medicare Program Administrator) in the amount of $3,488,557 (the "Overpayment").

167.    The Lindabury Opinion was misleading due to the failure to disclose that BMC had requested an extended payment plan to repay the Overpayment that, if accepted, would require BMC to make payments of $158,000 per month for two years thereby increasing BMC's liabilities by as much as $3.6 million during the time period the Note was outstanding.

168.    The Lindabury Opinion was misleading due to the failure to disclose that if BMC's extended repayment plan was not approved, the entire overpayment amount, nearly $3.5 million, would be immediately due and payable.

169.    The Lindabury Opinion was misleading due to the failure to disclose that, as a result of the extended repayment plan requested by BMC, repayment would extend until at least September of 2008.

170.    The Lindabury Opinion was misleading due to the failure to disclose that proceeds from the Note would be used to repay the Overpayment.

171.    The Lindabury Opinion was misleading due to the failure to disclose that BMC's right to appeal the Overpayment was currently pending and would expire within 180 days after September 15, 2006.

172.    The Overpayment, the extended repayment plan (and the chance it might not be approved), the use of Note proceeds to repay the Overpayment and the pending right to appeal were not disclosed to the Nuveen Fund.

173.    The Nuveen Fund read and reasonably relied upon the content of the Lindabury Opinion in making a decision with regard to purchasing the $10 million Note.

174.    The opinions that Lindabury agreed to and did provide to the Nuveen Fund in the Lindabury Opinion were an important prerequisite to the Nuveen Fund's agreement to purchase the Note. If Lindabury had adequately disclosed the nature and extent of the proceedings relating to the Overpayment or had refused to give any of the opinions contained in the Lindabury Opinion, the Nuveen Fund would not have purchased the Note.

**The Nuveen Fund Purchased the $10 Million Note**

175.   The Nuveen Fund purchased the $10 million Bond Anticipation Note from BMC on about October 11, 2006 (the "Note").

176.   BMC received a wire for the $9.5 million in Note proceeds that were called for under the Note Loan Agreement and the Nuveen Fund received back the Bond Anticipation Note executed by the President of Bayonne Medical Center.

177.   As alleged above and below in this Complaint, and unbeknownst to Nuveen, the 2005 Financial Statements, the unqualified audit report issued by WSB, the unaudited June 2006 Financial Statements and the Lindabury Opinion concealed the fact that BMC was rapidly approaching insolvency or was already insolvent, had violated the required 1.25 minimum debt service coverage ratio covenant as of the end of 2005 and was already in an uncured default on the Existing Bonds.

178.   In a letter dated October 23, 2006 the Riverbend Government Benefits Administrator notified BMC that it had approved a 24-month extended repayment plan requiring monthly payments of principal and interest totaling $3,878,908.92.

**BMC Began to Remove the Fraud From its Financial Statements Soon After the Nuveen Fund Purchased the Note**

179.   Bayonne Medical Center issued its monthly financial package for the month of October 2006 in December 2006.

180.   BMC reduced the debt service coverage ratio to a negative .87 in the October 2006 financial package.

181.   BMC wrote off $4.7 million in old 2005 receivables in the October 2006 financial package.

182.   BMC reduced revenues by $5.1 million as a result of settlements with Medicare in the October 2006 financial package.

183.   BMC hired Daniel Kane as the interim President and Chief Executive Officer of BMC in February 2007.

184.   Kane determined that BMC was insolvent and had been insolvent for some time.

185.   On April 12, 2007, the BMC board of directors adopted a resolution that BMC file a voluntary petition under the provisions of Chapter 11 of the Title 11 of the United States Code.

186.   BMC filed for Chapter 11 bankruptcy protection in April 2007.

187.   Kane's deposition was taken as part of the bankruptcy proceeding in May 2007.

188.    Kane testified that the $5 million Sham Pledge was unenforceable.

189.    Kane testified that the $5 million Sham Pledge was booked at the hospital entity to make it appear as if there was revenue being received that really was not being received and really was not going to be received.

190.    Kane caused BMC to take the $5 million Sham Pledge off of the BMC financial statements.

191.    Kane testified that BMC recognized an "Other Receivable" with respect to the acquisition of a hospital on Staten Island that was gradually increased to more than $28 million without any justification.

192.    Kane further testified that he estimated BMC had recognized about $30 million in overstated revenue or understated expense that would result in massive adjustments to the BMC Financial Statements.

193.    BMC is currently being liquidated in a Chapter 7 bankruptcy proceeding styled *In re: Bayonne Medical Center* Case No. 07-15195(MS).

194.    As a direct and proximate result of the wrongful conduct of WSB and Lindabury, the Nuveen Fund has suffered damages in an amount which is presently unknown but which is believed to be $9.5 million less any amounts recovered by the Nuveen Fund in connection with the bankruptcy proceeding, plus the attorney's fees the Nuveen Fund incurred in the bankruptcy proceeding.

195.    The above alleged acts and omissions of WSB were accompanied by a wanton and reckless disregard of persons who might be harmed by those acts and omissions.

## FIRST CLAIM FOR RELIEF
## COMMON LAW FRAUD

196.    The Nuveen Fund repeats the allegations of all preceding paragraphs of this Complaint and incorporates the same by reference.

197.    WSB made material misrepresentations and omissions of past and present facts as more fully alleged herein above.

198.    Defendant WSB knew, as a result of its auditing activities and its review of the Existing Bonds, that BMC would need to raise funds in order to continue operating as a going concern.

199.    BMC intended that the Nuveen Fund rely on the false and misleading statements contained in the 2005 financial statements and WSB's unqualified audit report.

200.    Defendant WSB knew that BMC would give the 2005 Financial Statements and WSB's unqualified audit report to actual and potential lenders and intended that those actual and potential lenders rely on the 2005 Financial Statements and WSB's unqualified audit report.

201.    Defendant WSB knew the above alleged representations in the 2005 Financial statements and unqualified audit report were false and misleading.

202.    The misrepresentations and omissions, as alleged above, were made by WSB with the knowledge that BMC would use the 2005 Financial Statements  and WSB unqualified audit report to mislead its creditors and potential lenders.

203.    The Nuveen Fund reasonably relied upon the representations contained in the 2005 Financial Statements and WSB's unqualified audit report and, as a direct and proximate result, has suffered substantial damages.

## SECOND CLAIM FOR RELIEF
## AIDING AND ABETTING COMMON LAW FRAUD

204.    The Nuveen Fund repeats the allegations of all preceding paragraphs of this Complaint, except paragraph 196, and incorporates the same by reference.

205.    BMC made material misrepresentations and omissions of past and present facts as more fully alleged above.

206.    BMC knew the misrepresentations and omissions were false and misleading.

207.    BMC provided the false and misleading statements to the Nuveen Fund with the intent that the Nuveen Fund rely upon them.

208.    The Nuveen Fund reasonably relied upon the misrepresentations and omissions.

209.    Defendant WSB was aware of this fraud and provided substantial assistance to advance the commission of the fraud.

210.    As a direct and proximate result of the above alleged wrongful acts, the Nuveen Funds has suffered damages.

## THIRD CLAIM FOR RELIEF
## NEGLIGENT MISREPRESENTATION

211.    The Nuveen Fund repeats the allegations of all preceding paragraphs of this Complaint, except paragraphs 196 and 204, and incorporates the same by reference.

212.    WSB provided information in connection with its audit examination of the 2005 Financial Statements in its unqualified audit report which WSB knew BMC would provide to creditors and potential investors.

213.    WSB owed a duty to those persons whom it knew it was reasonably foreseeable would be provided with the 2005 Financial Statements and the WSB unqualified audit report, including creditors and potential lenders to BMC.

214.    WSB owed a duty to BMC and to creditors and potential lenders to BMC to exercise reasonable care to ensure that the information contained in the 2005 Financial Statements and in the WSB audit report were complete, accurate and not misleading.

215.    WSB knew or should have reasonably foreseen that the 2005 Financial Statements and its unqualified audit report would be distributed to potential investors, and knew that potential investors would rely on the information provided in the 2005 Financial Statements when deciding whether or not to loan money to BMC.

216.    Defendant WSB breached its duty by negligently making the above alleged misrepresentations of and failure to disclose material facts.

217.    The Nuveen Fund reasonably relied upon the representations contained in the 2005 audited financial statements and the WSB unqualified audit report letter and, as a direct and proximate result, has suffered substantial damages.

218.    The Nuveen Fund is aware of the provisions of N.J. Stat. Ann. § 2A:53A-25.

219.    The Nuveen Fund is presently without knowledge or information sufficient to form a belief as to whether WSB knew that the Nuveen Fund, as opposed to potential investors or lenders in general, was going to be a recipient of the 2005 Financial Statements and WSB's unqualified audit report and is presently without knowledge or information sufficient to form a belief as to whether WSB authorized BMC to provide those documents to the Nuveen Fund in accordance with the provisions of N.J. Stat. Ann. § 2A:53A-25.

## FOURTH CLAIM FOR RELIEF
## NEGLIGENT MISREPRESENTATION
### (Against Lindabury)

220.   The Nuveen Fund repeats the allegations of all preceding paragraphs of this Complaint, except paragraphs 196, 204 and 211, and incorporates the same by reference.

221.   Lindabury provided the Lindabury Opinion to the Nuveen Fund under circumstances such that Lindabury knew or should have known that the Nuveen Fund would rely upon the Lindabury Opinion in making its decision with regard to purchasing the $10 million Note.

222.   Lindabury owed a duty to Nuveen to exercise reasonable care to ensure that the information contained in the Lindabury Opinion was complete, accurate and not misleading.

223.   Defendant Lindabury breached its duty by negligently making the above alleged misrepresentations of and failures to disclose material facts.

224.   The Nuveen Fund reasonably relied upon the representations contained in the Lindabury Opinion and, as a direct and proximate result, has suffered substantial damages.

## FIFTH CLAIM FOR RELIEF
## MALPRACTICE
### (Against Lindabury)

225.   The Nuveen Fund repeats the allegations of all preceding paragraphs of this Complaint, except paragraphs 196, 204, 211 and 220, and incorporates the same by reference.

226.   The Nuveen Fund sought advice and assistance from Lindabury through that portion of the October 11, 2006 Loan and Security Agreement between BMC and the Nuveen Fund that specifically requires, as a condition precedent to the funding of the Note, that BMC's counsel (Lindabury) provide Nuveen with an opinion letter in a form and substance satisfactory to Nuveen.

227.   The advice and assistance the Nuveen Fund sought from Lindabury required the giving of legal opinions within Lindabury's professional competence on various matters, including, without limitation, the existence or non-existence of various proceedings or inquiries.

228.    Lindabury agreed to provide the opinions sought by the Nuveen Fund by drafting the Lindabury Opinion, addressing it to the Nuveen Fund and providing it directly to the Nuveen Fund.

229.    An attorney-client relationship was created between the Nuveen Fund and Lindabury.

230.    The existence of the attorney-client relationship imposed upon Lindabury a duty to exercise due care commensurate with the generally accepted standards established and observed within the community in which Lindabury practices.

231.    Lindabury breached its duty of care with respect to the Nuveen Fund by failing to take appropriate steps to ensure that the information contained within the Lindabury Opinion was complete, accurate and not misleading and by negligently making the above referenced misrepresentations of and failures to disclose material facts.

232.    The Nuveen Fund reasonably relied upon the opinions and representations made by Lindabury in the Lindabury Opinion and, as a direct and proximate result, the Nuveen Fund has suffered substantial damages.

**RELIEF REQUESTED**

**WHEREFORE**, the Nuveen Fund requests that the Court enter judgment in its favor and against WSB on each of the Nuveen Fund's claims for relief and awards the Nuveen Fund:

    (a)    money damages;

    (b)    prejudgment interest;

    (c)    costs;

    (d)    punitive damages; and

    (e)    any other relief which the Court deems proper.

**PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY ON ALL ISSUES TRIABLE AS OF RIGHT BY JURY.**

Dated this 25th day of November, 2008

SOLOMON BLUM HEYMANN & STICH LLP

By: _____

David P. Stich, A Member of the Firm
40 Wall Street, 35th Floor
New York, New York 10005
Tel: (212) 267-7600
Fax: (212) 267-2030

DAVIS & CERIANI, P.C.
Michael P. Cillo, Esq*
Scott Wilkinson, Esq*
1350 Seventeenth Street, Suite 400
Denver, CO 80202
Tel: (303) 534-9000

*to be admitted pro hoc vice